# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

**TROY T. CORNOCK,**

**Plaintiff**

**v.**                                    **CIVIL NO.  1:07cv391**

**BANK OF AMERICA, NATIONAL ASSOCIATION**
**formerly MBNA America Bank, N.A., by merger, et al,**

**Defendants.**

## PLAINTIFF'S MEMORANDUM IN OPPOSITON TO DEFENDANT TRANS UNION, LLC's MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff Troy Cornock, by Counsel, and for his Opposition to the Summary Judgment Motion filed by Defendant Trans Union, LLC, he states as follows:

### OVERVIEW

Credit card company MBNA America Bank, N.A. (now Bank of America subsidiary FIA Card Services, N.A.) ("MBNA") opened an account in the name of Troy Cornock even though he never applied for the account, never used it and never agreed to its opening. In fact, he never even knew about the account until it was already defaulted and reported as a charge-off in his Trans Union credit report. The account was apparently opened by a former family member, the Plaintiff's ex-wife as they were separating and he was moving out of their home. Troy Cornock actually litigated the account in state Court, obtaining a harshly critical Summary Judgment decision against MBNA finding that there was not a contract between the Bank and Mr. Cornock. And Mr. Cornock made three very detailed credit reporting disputes to Trans Union. He

1

provided all details regarding the likely identity theft. He provided his ex-wife's name and address. He provided handwriting exemplars and offered to pay a handwriting expert. And he asked that if Trans Union would not investigate his dispute if it would at least put him in touch with the actual employee at MBNA responsible for handling credit reporting disputes – a name and telephone number known to the Defendant. Despite Mr. Cornock's efforts, Trans Union did what it always does – it relied on an automated dispute system using outsource vendors in India to do nothing more than regurgitate its customer MBNA's automated response to the dispute: "Account information accurate." In doing so, Defendant ignored the consensus law established in 1997, *Cushman v. Trans Union,* 115 F.3d 220 (3rd Cir. 1997), and by adopted of *Cushman* in this Circuit as recently as 2008, *Deandrade v. Trans Union LLC.* 523 F.3d 61 (1st Cir. 2008). In fact, the core issue in *Cushman* was the same as in this case. As presently, in *Cushman,* Trans Union contended that

> 1681i(a) did not impose on it an obligation to do any more than perform the reinvestigation it performed in this case. That is, TUC believes that when a consumer informs a consumer reporting agency that information contained in her consumer report is inaccurate, the consumer reporting agency is obliged only to confirm the accuracy of the information with the original source of the information. According to TUC, it is never required to go beyond the original source in ascertaining whether the information is accurate.

115 F.3d at 224. As the Third Circuit explained, "This position has been rejected by the United States Courts of Appeals for the Fifth and Seventh Circuits. *See Henson,* 29 F.3d at 286-87; *Stevenson v. TRW Inc.,* 987 F.2d 288, 293 (5th Cir.1993)." Now Trans Union asks this Court to find as a matter of law that it may rely entirely on its credit grantor customer, MBNA, and seeks Summary Judgment in a case in which by its own

admission all it did was "parrot" its furnisher. As must this Court, the Third Circuit rejected Trans Union's narrowed view of the remedial FCRA:

> The "grave responsibilit[y]" imposed by §1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute.

115 F.3d at 225.

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIALS FACTS AND RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Some of Defendant's stated facts are disputed. Others are not disputed, but are incomplete. Pursuant to Local Rule 7.2(b)((2), the Plaintiff responds as follows1:

1.     Paragraph 1 is undisputed.   The subject MBNA credit card was opened by the Plaintiff's ex-wife, Lisa Cornock.

2.     Paragraph 2 is undisputed, but misleading.   Trans Union is correct that Lisa Cornock's MBNA account was opened while the Plaintiff and his ex-wife were married and while she lived at the marital home.  However, the account was opened in June 2005, the month the Plaintiff and his ex-wife separated and the month he moved out of the marital home.  Plaintiff's Exhibit A, *Declaration of Troy Cornock*; Defendant's Exhibit 2, *Order on Defendant's Motion for Summary Judgment, Superior Court, 03-C-0018*, p.1-2.

3.     Paragraph 3 is undisputed.   Lisa Cornock's MBNA account statements came to her at her home.   However, as stated in paragraph 2, Mr. Cornock had already moved

---

1 Plaintiff has followed Defendant's numbering structure and will add additional numbered paragraphs thereafter.  When Mr. Cornock believes that facts stated in a particular numbered paragraph are incomplete, he has added appropriate additional facts to inform the Court's understanding.

from that home before any statements could have been sent there. *Id.*, p.2.

4.   Paragraph 4 is disputed.   Lisa Cornock did not make her payments to MBNA on a joint banking account.   First, it is puzzling why Trans Union cites to "¶7 infra" for its record support.   Nothing in that paragraph or the State Order referenced in same evidences that the account was paid in a joint account.   *See* Defendant's Exhibit 2.   In fact, the State Order establishes (a.) the Cornock's were separated in June 2005, p.1, and (b.) the payments were made by Lisa Cornock in 1996 and thereafter, *Id.*, p.2.   The only reference to a "joint account" is at the bottom of page 2 of the State Order, "Apparently the joint account listed [Mr. Cornock] as the primary holder of the account."  There is no evidence that the Plaintiff actually agreed to his listing on that checking account or that he received any records or statements from same – only that it listed him on the account. Regardless, and while this fact is really immaterial to the present case and motion, the Plaintiff states under oath that the referenced checking account was not his account. Plaintiff's Exhibit A.

5.   Paragraph 5 is undisputed.   After their June 2005 formal separation, the Cornock's divorce became final in 1998.

6.   Paragraph 6 is undisputed.   MBNA never contacted the Plaintiff and he never knew of Lisa Cornock's account until 1998 or 1999 when he was contacted by a MBNA collector.   At that time, "[Mr. Cornock] made them well aware that it wasn't [his] credit card." Defendants Exhibit 1, *Deposition of Troy Cornock*, 20:21-23.

7.   Paragraph 7 is undisputed.   The State Order granted Summary Judgment to Mr. Cornock finding that there was never a contract between he and MBNA to compel arbitration.   Defendant's Exhibit 2. However, this fact is immaterial to the present case

4

and motion.  Trans Union does not claim that it ever had knowledge of that "Arbitration Award" before the present litigation.  In fact, it appears that the only record evidence to inform the Court as to how Tran Union learned of the NAF proceeding was by the State Order in which that proceeding was found legally immaterial and unenforceable.  Thus Trans Union's knowledge of the arbitration award was not a basis for any decision or action it may have taken – it only learned of the arbitration itself after the present lawsuit was commenced.

8.    Paragraph 6 is undisputed.  Plaintiff did not learn that Trans Union was reporting Lisa Cornock's MBNA account in his credit report until sometime after 2004.

9.    Paragraph 9 is disputed – or at least the Defendant's interpretations therein are disputed.    The Plaintiff mailed Trans Union a detailed dispute letter in December 2005 just as Defendant admits.    In addition, Trans Union is correct that it rejected that dispute letter because its own internal number for the MBNA account was apparently different than the number Mr. Cornock had received from MBNA.    The remainder of Defendant's claims are incorrect.    The account number was not "erroneous", it just differed from Trans Union's own internal numbering for the account.  Plaintiff's Exhibit B, *Troy Cornock December 14, 2005 Dispute*. There was still only one such credit card account in Trans Union's records.  Further, the letter was sufficiently detailed that Trans Union could have contacted MBNA to learn of any relationship to the account number Defendant itself had used for the Lisa Cornock account.    Nevertheless, as Defendant admits, Trans Union refused to even investigate any aspect of MBNA's reporting.

10.    Paragraph 10 is undisputed.  The Plaintiff sent a letter concerning the MBNA account and provided the information Defendant recites.  However, there is even more

relevant and related evidence in Defendant's own record.  Mr. Cornock actually sent two more January dispute letters – his second and third overall – both received by Defendant on the same day – January 16, 2006.  Defendant's Exhibits 3-A and 3-B.  In addition to the information acknowledged in Defendant's Paragraph 10, the letters also provided significant additional information:

- The name of Mr. Cornock's ex-wife and where she resided;
- Exemplars of Mr. Cornock's signature;
- Mr. Cornock's agreement to pay Trans Union's expense for a handwriting analyst;
- The name of the person at MBNA with whom Mr. Cornock had spoken regarding the Lisa Cornock account;
- Telephone numbers for himself and an additional third party witness that Trans Union could have contacted;
- Mr. Cornock's request that Trans Union forward the detailed dispute to its internal contact at MBNA in order to permit him to circumvent the collection department employees otherwise without authority to correct his credit file; and
- Mr. Cornock's request that Trans Union telephone him if it needed any additional information or documents that would be useful for its investigation.

*Id.*

11.    Paragraph 10 is undisputed.    Trans Union is correct that the Plaintiff's dispute letters did not detail MBNA's claim that it had obtained an NAF arbitration award.  While this fact is certainly immaterial to the present case or motion, it is also undisputed that Trans Union never contacted either Mr. Cornock or MBNA to obtain or consider such information.   And it has to be undisputed that Trans Union never considered any asserted arbitration award in its decision to blindly accept MBNA's instructions to reject Mr. Cornock's three disputes.

12.    Paragraph 12 is disputed – or at least the Defendant's interpretation of the evidence cited therein is disputed.  Defendant cites to the written testimony of its employee Eileen Little.   There is no evidence as asserted that the ACDV system used by

6

Trans Union represents an "industry standard", only that it is used in the credit industry. Further, Ms. Little cannot and does not address the FTC FACTA report.   In order to maintain a sense of order to this briefing, Plaintiff will address that argument in separate paragraphs below.  Defendant is correct that Trans Union relied solely on its automated process, ACDV, also addressed below.

13.   Paragraph 13 is undisputed.  Trans Union's single ACDV is attached as Defendant's Exhibit 3-B.  It is explained below.

14.   Paragraph 14 is disputed.  There is no evidence that MBNA ever "verified" the account.  See *Johnson v. MBNA America Bank, N.A.*, 357 F.3d 426, 432 (4th Cir. 2004) (MBNA "verifies" its account by providing Trans Union information to show it has a credit application signed by the consumer.).  Instead, it responded by electronically clicking the "Response Code" – "01", which then reads as "Account information accurate as of date reported." Defendant's Exhibit 3-B.  Further, the MBNA response to Trans Union actually revealed that MBNA was reporting a different address for the account than that at which Trans Union had confirmed the Plaintiff lived.   *Id.* (The "D", for "Different" for the "Addr" line under "Subscriber Changes to Consumer Demographics").  MBNA also acknowledged to Trans Union that it did not know of any other previous addresses for the account ("U" for "Unknown"). *Id.*    The ACDV also provided Trans Union a live person and telephone number at MBNA, Denise English – a person and number never contacted and used by Trans Union and never provided in Trans Union's response to Mr. Cornock's dispute.   Defendant's Exhibit 3-C.   The ACDV also evidences by omission that Trans Union never followed Mr. Cornock's request that he forward his dispute documents directly to Ms. English or alternately

provide him Ms. English's contact information. *Id.*; Defendant's Exhibits 3-A and 3-D.

15.     Paragraph 15 is disputed.  It is true that the Plaintiff did not use the language Trans Union insists on to record the consumer's statement that the account is disputed.  Nevertheless, Mr. Cornock's letters are detailed and they plainly state the nature of his dispute.  These facts however are also immaterial to the present case or motion.  Unlike in some cases, Mr. Cornock has not asserted a violation of 15 U.S.C. §1681i(b) ("Statement of dispute.  If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute.").  All of the violations in this case are alleged under §1681i(a).   Regardless, and likely otherwise unknown to most Courts or even non-FCRA counsel, such a "Statement of Dispute" placed by Trans Union is meaningless and is entirely ignored in credit scoring. Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 145:15 – 146:7.

16.     Paragraph 16 is disputed.  Trans Union's own documents evidence at least two disputes.  Defendant's Exhibits 3-A and 3-D.

17.     Paragraph 17 is undisputed.  The State Order denied MBNA's Motion for Summary Judgment and Granted Mr. Cornock's Motion for Summary Judgment on the existence of a contract (necessary for there to be an agreement to arbitrate).  Defendant's Exhibit 2.  In fact, the State Order also allowed Mr. Cornock's tort claims for Malicious Prosecution to continue until they were settled together with MBNA's abbreviated defense of the present case.

18. Paragraph 18 is undisputed. Trans Union did not delete the MBNA account until it was sued in this case. It remained on the Plaintiff's credit file since at least sometime in 2004, and over two years from the date Mr. Cornock made the first of his three disputes. Certainly this is also at least an acknowledgment that the Defendant has confirmed that it's earlier reporting was inaccurate.

19. Paragraph 19 is undisputed. Mr. Cornock does not live at the address MBNA reported to Trans Union.

20. Paragraph 20 is undisputed. Mr. Cornock learned that he was charged a higher interest rate to purchase his motorcycle because of Trans Union's reporting of the MBNA account.

21. Paragraph 21 is disputed. Mr. Cornock provided his personal information to third party Chase Mortgage and requested its pre-approval of his mortgage loan. Contrary to Defendant's characterization of the evidence, the Court at a minimum knows: (1.) the Plaintiff applied for pre-approval to Chase; Plaintiff's Exhibit D, *Supplemental Declaration of Troy Cornock*; (2.) Chase used his Trans Union credit report at the time that it contained the inaccurate MBNA account and at which this was the only serious derogatory item in his Trans Union file. Plaintiff's Exhibit E, *Troy Cornock Trans Union Credit Report May 3, 2007* and (3.) Chase did not provide Mr. Cornock pre-approval or other loan. Plaintiff's Exhibit E. Plaintiff's counsel has also confirmed the accuracy of an additional supporting Declaration from Chase, but was unable to obtain a signed copy by May 21, 2009. He will ask the Court for leave to file it when received.

22. Paragraph 22 is undisputed. Troy Cornock has settled his claims against MBNA and two other CRA defendants. He is not now seeking as against Trans Union

additional damages relief for emotional distress, frustration or other related soft injuries, otherwise recoverable under the lower threshold of the FCRA.    Instead, he seeks damages for his inability to obtain a Mortgage, or in the alternative statutory damages, and he seeks punitive damages.  15 U.S.C. §1681n.

22.    Trans Union never conducts a substantive investigation.  When the Trans Union employee receives a consumer's dispute, he or she follows a simple process of six steps, most of which are simply keystroke steps:

1. Use the mouse to click on the disputed tradeline on the Trans Union computer screen;
2. Use the mouse to click on the button for "Dispute" under that tradeline;
3. Use the mouse to select the pull down menu and chose a "claim code" that is closest to the type of dispute made by the consumer.
4. Type in a consumer comment if the consumer's dispute is not summarized by one of Trans Union's pull-down claim codes;
5. If the creditor has more than one electronic address for disputes, use the mouse to select the correct creditor address in the pull down menu;
6. Use the mouse to press the "Done" button.

Plaintiff's Exhibit F, *Trans Union Dispute Procedures*; Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 124:14–142:13.

24.    Under Trans Union's ACDV dispute policy, unless the creditor, like MBNA, asks or agrees to remove its collection account or charge off from Trans Union's file, and so long as it selects "verified" to two pieces of the consumer's identity (e.g. name, social security number, date of birth or address) there is literally nothing the consumer can do to make that happen. *Id.*, 146:9-147:22.

25.    In this case, Trans Union's employees used "claim codes" A4 and D2.  These print out, respectively with the boilerplate text: "A4: Not liable for Acct (i.e. Ex-Spouse,

Business).  If Liable, provide Complete ID and ECOA Code"; and "D2: Claims True Identity Fraud, Account Fraudulently Opened.  Provide or Confirm Complete ID." Defendant's Exhibit 3-B, p.3.  This text is automated. Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 122:8-18.

26.    Trans Union's loyalty is to furnishers such as MBNA that are as well its paying customers (subscribers). Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 114:16-115:20.

27.    All the creditor ever receives from Trans Union is the one page ACDV form, like Defendant has produced in this case. *Id.*, 121:7-24; Defendant's Exhibit 3-B.  Trans Union never sends the consumer's dispute letters, documents (such as the handwriting exemplars) or detailed information in the disputes. Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 133:10-134:21.  Trans Union is aware of the criticism that it never forwards "all relevant information" to the creditor as required by §1681i(a) of the FCRA. *Id.*, 133:10-18.

28.    In the Trans Union dispute steps that form Defendant's entire process, only three of the six steps permit anything other than clicking on a button (such as selecting the "Done" button) or involve any degree of human decision – Step 3 (Select the claim code), Step 4 (add a consumer comment) and Step 5 (select an alternate address to send the ACDV to creditor).  In this case, Trans Union's employees did not use Step 4 to add a one-line comment. *Id.*  There is no evidence that there was more than one electronic

address for MBNA to which an ACDV could be sent.   Thus, besides the mere clicking of screen openings or pressing "Done", the only "meaningful" action taken by a Trans Union employee in processing Mr. Cornock's disputes would have been Step 3 – select a claim code.

29.   After Trans Union presses the "Done" button, the ACDV is sent to MBNA and no human being ever again sees, considers, reviews or acts regarding the dispute or the creditor's response. Plaintiff's Exhibit C, *Trial Testimony of Trans Union witness Eileen Little, Mullins v. Trans Union*, 3:05cv888, (E.D. Va. 2007), 142:10-144:11. This is entirely an automated process that depends to 100% on what the creditor tells Trans Union to do with the disputed account with its three electronic options:   selecting "verified", "deleted" or "modify account information." *Id.*

30.   Trans Union's claim that the FTC report somehow legitimized the ACDV procedures actually used by Trans Union is entirely unsupported by the record, and certainly by the FTC report.   In fact, the FTC report simply summarizes the CRA's position and contrasts it with the consumer protection position.

However, this does raise additional notice or willfulness concerns upon Trans Union's refusal to comply with the FCRA as it was cautioned and informed by multiple Federal Courts.   In fact, in *Mullins v. Trans Union, supra*, Senior District Judge Payne instructed the jury:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of Federal Court have informed Trans Union, in cases in which it was a Defendant, that the Fair Credit Reporting Act's requirement for a Reasonable Reinvestigation must consist of something more than simply parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

12

In this FTC process, Trans Union participated with its industry lobbyists to attempt to influence that very FTC report.   These communications were obtained by Plaintiff's counsel and, in part, they evidence significant efforts by Trans Union to influence the FTC report and to respond to the FTC request to address the Congressional testimony of present Plaintiff's counsel.2   (John Blenke is Trans Union's in house attorney). Plaintiff's Exhibit G, *Trans Union CDIA Communications regarding FTC Report*.

## ARGUMENT

**I.     A REASONABLE JURY COULD FIND THAT TRANS UNION VIOLATED SECTION 1681i(a) OF THE FAIR CREDIT REPORTING ACT.**

The Plaintiff has alleged that Defendant violated the Federal Fair Credit Reporting Act (FCRA), 15 U.S.C. §1681e(b) and 1681i(a).  Trans Union is a "consumer reporting agency." ("CRA")  Section 1681e(b) requires the CRAs to use "reasonable procedures to assure maximum possible accuracy" of the credit reports they furnish. Section 1681i(a) requires the CRAs to conduct a substantive, meaningful and reasonable investigation of a consumer's dispute about inaccurate information in his credit file.  As a recent jury in a Trans Union case was instructed, "the word 'reinvestigation' means the credit reporting agency must conduct a detailed inquiry or systematic examination by making careful inquiry into the disputed matter." *Mullins v. TransUnion*, 3:05cv888, (E.D. Va. 2006).  Because the present claims almost entirely overlap, with §1681e(b) requiring a higher degree of proof, Plaintiff agrees to the dismissal of his claim under that Section and will litigate solely his claims under §1681i(a). *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3rd Cir. 1997) ("In short, when one goes from the § 1681e(b)

---

2 http://financialservices.house.gov/media/pdf/060403lb.pdf.

investigation to the § 1681i(a)*re* investigation, the likelihood that the cost-benefit analysis will shift in favor of the consumer increases markedly. Judgment as a matter of law, even if appropriate on a § 1681e(b) claim, thus may not be warranted on a § 1681i(a) claim.")

In this case, Defendants' bank customer, MBNA (now wholly owned by Bank of America and operating as FIA Card Services) placed the Plaintiff's identity information in its account opened without his knowledge or consent by his ex-wife. In an earlier filed state court action, MBNA's summary judgment motion as to the indebtedness was denied and Cornock's own motion was granted in a written opinion sharply critical of MBNA. While that case was pending and again after this state order was entered, the Plaintiff provided his information and the details of the case to Trans Union asking that it conduct its own reinvestigation and remove the MBNA account – showing as a chargeoff – from his credit file. Trans Union refused and instead used its standard procedure:  an automated system through an outsource vendor in Mumbai, India sending a two-digit dispute code to MBNA. When the CRAs' customer, MBNA, checked the box "verified" in its generic electronic response, Trans Union refused to remove the inaccurate information from Mr. Cornock's file and credit reports. The real question in the present motion is whether Trans Union's automated reliance solely on its creditor-customer's reporting constitutes a "reasonable reinvestigation" as a matter of law.    If this Court found such for Trans Union, it would be the first in the nation to do so and would do so in the face of numerous reported cases, including *Cushman v. Trans Union*, adopted by the First Circuit in *Deandrade v. Trans Union. See infra.*

The Plaintiff now pursues a single claim, Trans Union's alleged violation of the most often litigated FCRA section, 15 U.S.C. §1681i(a).  This Section, which governs

14

consumer credit reporting disputes, imposes a number of duties on a consumer reporting agency (CRA) including that it conduct a "reasonable reinvestigation" (§1681i(a)(1)(A)), that it review and consider all of the information and documents the consumer provides in her dispute (§1681i(a)(4)), and that it send "all relevant information" provided by the consumer to the creditor/furnisher (§1681i(a)(2)(A)).    In relevant part and with underlined emphasis added, the section states:

§ 1681i. Procedure in case of disputed accuracy
(a)        Reinvestigations        of        disputed        information
(1) Reinvestigation required.--
(A) In general.--Subject to subsection (f) of this section, <u>if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency</u> directly, or indirectly through a reseller, of such dispute, <u>the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file</u> in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.
(B) Extension of period to reinvestigate.--Except as provided in subparagraph (C), the 30-day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30-day period that is relevant to the reinvestigation.
(C) Limitations on extension of period to reinvestigate.--<u>Subparagraph (B) shall not apply to any reinvestigation in which, during the 30-day period</u> described in subparagraph (A), <u>the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.</u>

(2) Prompt notice of dispute to furnisher of information.--
(A) In general.--Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer or a reseller in accordance with paragraph (1), <u>the agency shall provide notification of the dispute to any person who provided any item of information in dispute</u>, at the address and in the manner established with the person. <u>The notice shall include all relevant information regarding the dispute that the agency has received from the consumer</u> or reseller.    [ . . . ]

(4) *Consideration of consumer information.*--In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, <u>the consumer reporting agency shall review and consider all relevant information submitted by the consumer</u> in the period described in paragraph (1)(A) with respect to such disputed information.

(5) *Treatment of inaccurate or unverifiable information.*--
(A) In general.--<u>If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall--</u>
<u>(i) promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate,</u> based on the results of the reinvestigation; and
(ii) promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer[.]

Restated, with the superfluous text removed, §1681i provides the following duties all of which Plaintiff alleges Trans Union violated:

1.    If the completeness or accuracy of any item of information contained in a consumer's file is disputed by the consumer directly, the agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file. §1681i(a)(2)(A).

2.    The notice [that the CRA provides to the creditor/furnisher after receiving the consumer's dispute] shall include all relevant information regarding the dispute that the agency has received from the consumer. §1681i(a)(2)(A).

3.    The consumer reporting agency shall review and consider all relevant information submitted by the consumer. §1681i(a)(4).

4.    [The CRA must immediately remove disputed information if it determines that] the information that is the subject of the reinvestigation is […] inaccurate or incomplete or […] cannot be verified.  §§1681i(a)(2)(C) and 1681i(a)(5).

Trans Union violated each of these provisions.  It failed to do anything to reinvestigate the Plaintiff's disputes beyond send a claims code to MBNA.   It did not provide to MBNA anything close to all relevant information (e.g. handwriting samples, witness

names and addresses, details of the Plaintiff's addresses and his separation and divorce), and it obviously did not correct and delete the inaccurately reported MBNA account from Mr. Cornock's credit file for the two years preceding the filing of a federal lawsuit.

Trans Union's entire challenge is to the FCRA §1681i(a) liability is derived from its incorrect reading of the First Circuit's decision *Deandrade v. Trans Union LLC.* 523 F.3d 61 (1st Cir. 2008). Mr. Cornock's case – one in which the Plaintiff has alleged that he was the victim of identity theft and that MBNA did not possess a credit card application, charge slip or payment record with his signature – presents facts and a claim that is <u>entirely unlike</u> *Deandrade*. Even more critically, the facts and claim in this case are <u>entirely like</u> those in *Cushman v. Trans Union,* 115 F.3d 220 (3rd Cir. 1997), the seminal decision cited favorable and by implication adopted by the First Circuit in *Deandrade.*

In *Deandrade*, the Court considered a consumer's claim that the financing of windows he had purchased violated the Federal Truth in Lending Act, 15 U.S.C. § 1600, *et seq.* and was a credit contract to which he was not obligated to pay because it was not signed. In *Deandrade*, the consumer acknowledged incurring the debt generally. He acknowledged purchasing and financing the windows. And the evidence established his knowledge of the credit obligation. Accordingly, the case involved a simple <u>legal question</u> – whether or not Deandrade had "ratified" the credit contract, even though both parties agreed he did not personally sign the contract.3 It certainly should be as puzzling

---

3 For confirmation of Plaintiff's position as to the issues actually considered and ruled upon in *Deandrade*, this Court should also consider Trans Union's actual argument before the District Court in that case:

Trans Union's argument regarding ratification can be

to this Court as it is to Mr. Cornock's counsel why such a lawsuit was ever filed in the first place, let alone appealed to the First Circuit.    The Court of Appeals decision is not controversial.    But it is also not relevant to the present case.    *Deandrade* holds unremarkably that a legal defense to a credit obligation is not subject to dispute through a FCRA dispute.    The First Circuit's entire conclusion is stated:

> To determine whether a consumer has identified a factual inaccuracy on his or her credit report that would activate § 1681i's reinvestigation requirement, "[t]he decisive inquiry" is whether the defendant credit bureau could have uncovered the inaccuracy "if it had reasonably reinvestigated the matter." *Cushman*, 115 F.3d at 226 (citations omitted). The KeyBank debt reported by Trans Union does not fall under this rubric. Here, there is no dispute that DeAndrade received windows financed by a mortgage on his home; what DeAndrade is attacking is the mortgage's validity. Whether the mortgage is valid turns on questions that can only be

> summarized as follows. Plaintiff requested that NESCOR arrange mortgage financing to pay for the windows which he had contracted to purchase, and that the amount of the monthly payments not exceed an agreed upon amount. Plaintiff admits that he did not know who the lender would be. Plaintiff also admits that he signed documents which facilitated NESCOR's efforts to obtain a loan. NESCOR notified Plaintiff that it had obtained financing. The monthly payments for the loan which NESCOR obtained for Plaintiff from Key Bank were in the amount which Plaintiff had requested and had agreed to pay. Plaintiff received two invoices and then a coupon book from Key Bank and duly made twenty-two monthly payments to Key Bank from September 2001 to June 2003.

> In short, Trans Union argues that Plaintiff's use and enjoyment of the windows and twenty-two months of payments to Key Bank establish Plaintiff's ratification and acceptance of the Key Bank loan. Because Plaintiff was liable for the loan and wrongly stopped payments, Trans Union contends that its reporting of that history is accurate.

*Deandrade v. Trans Union, LLC*, 2006 WL 5671233, *4 (D.R.I. 2006) (record citations omitted).

> resolved by a court of law, such as whether DeAndrade ratified the loan. This is not a factual inaccuracy that could have been uncovered by a reasonable reinvestigation, but rather a legal issue that a credit agency such as Trans Union is neither qualified nor obligated to resolve under the FCRA.
>
> In essence, DeAndrade has crossed the line between alleging a factual deficiency that Trans Union was obliged to investigate pursuant to the FCRA and launching an impermissible collateral attack against a lender by bringing an FCRA claim against a consumer reporting agency. *See Wadley,* 396 F.Supp.2d at 679-680 ("The FCRA does not provide a cause of action to collaterally attack an accurate credit report.")

*Deandrade,* 523 F.3d at 68.  In fact, the Court of Appeal's citation to *Cushman* and

*Wadley* is instructive.

In *Cushman,* the nation's seminal §1681i(a) case, the facts were nearly identical

to those in this case – a family member used the Plaintiff's identity to open a credit card

account that the consumer knew nothing about.   The Third Circuit described these facts

as follows:

> In the summer of 1993, an unknown person, possibly a member of her household in Philadelphia, applied under Cushman's name for credit cards from three credit grantors: American Express ("Amex"), Citibank Visa ("Citibank"), and Chase Manhattan Bank ("Chase"). The person provided the credit grantors with Cushman's social security number, address, and other identifying information. Credit cards were issued to that person in Cushman's name, and that person accumulated balances totaling approximately $2400 on the cards between June of 1993 and April of 1994. All this occurred without Cushman's knowledge.

*Cushman v. Trans Union Corp.,* 115 F.3d 220, 222 (3rd Cir. 1997).   It was this fact

pattern, by the First Circuit's favorable citation to *Cushman* that Court of Appeals in

*Deandrade* considered an example of a case where a <u>factual inquiry</u> by "the defendant

credit bureau could have uncovered the inaccuracy if it had reasonably reinvestigated the

matter." *Deandrade,* 523 F.3d at 68. The First Circuit's adoption of *Cushman* is

dispositive and is also not unexpected. Its reliance on *Cushman* is consistent with nearly

every court to weigh in on §1681i.  The question in <u>this</u> case, as in *Cushman* was whether

or not the creditor-furnisher had an application or documents signed by the Plaintiff. There is no technical or complicated legal question. It is purely a factual inquiry. Trans Union had an obligation to contact MBNA and conduct its own review of the account at issue in order to resolve for itself that factual question. By its own admission, Trans Union admits it did not and never does any such thing. It relies entirely on the decision of its customer-subscriber, MBNA, to decide whether to continue reporting the account.

*Cushman* is without question the seminal case defining a CRA's FCRA duties under 15 U.S.C. §681i. Nearly every Court applying §1681i has cited it. *Soghomonian v. United States* (and Trans Union), 278 F.Supp.2d 1151, 1155 ("[T]he case law is clear that a credit reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information.") (emphasis added). It was decided in 1997 and stands for the simple proposition that the statutory reinvestigation requires more than merely "parroting" the creditor/furnisher. Contrary to Trans Union's bare assertions, §1681i does require more that blind acceptance of the creditor's response. *Cushman*, 115 F.3d at 225. ("The "grave responsibility[y]" imposed by §1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a "reinvestigation" that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."). In fact, in *Cushman*, the Third Circuit criticized Trans Union's claim that there was nothing more it could investigate. The Court detailed the failures of Trans Union's same procedures in a case in which the consumer claimed that an a credit card account was opened by another person:

> TUC's investigations are performed by clerks paid $7.50 per hour and who are expected to perform ten investigations per hour.

> There is no evidence that TUC took the necessary steps to obtain access to pertinent documents from the credit grantors that would enable TUC to perform a handwriting comparison. TUC did allow Cushman the opportunity to complete a form requesting that a special handling statement be placed on her report, and that form required her signature. However, a TUC employee testified that the form would not have been used for a handwriting comparison had Cushman completed it. TUC advises consumers in Cushman's position to communicate with the credit grantors and complete signature verifications and affidavits of fraud with the credit grantors.

*Cushman*, 115 F.3d at 222. There is literally no difference between these detailed Trans Union's failures from 1997 and those in the present case. Defendant still never exercises its own discretion. It still ignores the consumer's claims and evidence. It still refuses to do anything other than ask its creditor-customer whether or not it wants the challenged account to remain in the consumer's credit reports. In fact, from the facts stated in *Cushman* the Court could expect that in 1997, employees actually interacted manually with creditors like MBNA. Today, there is no such interaction – there certainly wasn't in this case – and the only role of the Trans Union employee is to select and e-mail a "claims code" from a computer's pull-down menu.

Trans Union has tried to jam the present facts, the exact facts considered in *Cushman*, identity theft by a family member, into the category of "legal inquiry" as raised by the facts in *Deandrade*. But the fcats in this case much more closely fit those in *Cushman*, what *Deandrade* labeled a factual inquiry, than those in *Wadley*, the case the Court used to describe a "legal inquiry." *Wadley v. Equifax Information Services, LLC.* 396 F.Supp.2d 677 (E.D. Va. 2005). □Like in *Deandrade* and unlike in *Cushman* and the present case, in *Wadley* the consumer admitted entering into the credit obligation, but asserted an affirmative defense to the debt. In *Deandrade*, the product financed was a set

of windows and the affirmative defense was the Federal Truth in Lending Act.   In *Wadley*, the product was an automobile and the affirmative defense was the Lemon Law:

> In this case, Mr. Wadley admits that he entered into a loan with FMCC, failed to pay the loan, and that the loan was reported to Equifax as delinquent, but argues that he should not have to pay the loan because his car was defective. Plaintiff offers no evidence to show that Equifax inaccurately reported the status of Mr. Wadley's loan with FMCC. Because Mr. Wadley offers no evidence that Equifax inaccurately reported the loan, he has failed to establish that the consumer report contains inaccurate information, which is an essential element of a FCRA claim. Accordingly, the Court grants Defendant's Motion for Summary Judgment.

*Id.* at 679.   Trans Union's interpretation of *Deandrade* would make no sense in the face of the heavy reliance of the First Circuit on *Cushman* and the Court's analogizing of its facts with those in *Wadley*.

## II.   A REASONABLE JURY COULD FIND THAT TRANS UNION'S CONDUCT WAS WILLFUL.

Trans Union also argues that its conduct is excused from a claim of willfulness by *Deandrade* just as was Plaintiff's negligence claim.   Defendant's strained and unsupported stretch of Deandrade has been addressed *supra*.   Defendant does not assert any further argument as to willfulness in its Summary Judgment motion and could not now properly raise a new basis or argument in reply.   Trans Union likely has sought to avoid that argument in order to avoid any discussion of the many other judicial rulings harshly criticizing this specific Defendant in cases opposed by this specific Defense team.

It is remarkable that Trans Union omits not only *Cushman*, but also any mention of the unbroken chain of FCRA decisions ruling exactly the opposite as Defendant asks this Court to find.   For example, in *Crane v. Trans Union*, 282 F.Supp.2d at 316, the agency used the same procedures manuals and the same witness, Eileen Little, as it did in

this case. The Court's description of the evidence in the Pennsylvania case could read almost exactly as would the evidence at present, including testimony from the same Affiant:

> [Eileen] Little has testified that TU, as a matter of policy, would report whatever information creditors, such as Hann, had "verified," generally without TU independently investigating whether that information was in fact accurate.

> On February 20, 2001, Crane submitted a written request for TU to investigate the status of his Hann account. This request included several supporting documents, including a copy of Karnatski's August 4, 2000 letter. Little Decl. ¶ 5. In response to Crane's request, a TU employee prepared a Consumer Dispute Verification form ("CDV") FN5 on February 28, 2001. See Little Decl. Ex. 3. When he or she forwarded the CDV to Hann, however, the employee did not include the documentation Crane provided because, according to the testimony FN6 of Eileen Little ("Little"), TU's group manager of consumer relations, TU's policy was to send the CDV without ever including such documentation.

282 F.Supp.2d at 315-316. This is the exact evidence that Trans Union now contends could not support a verdict finding the conduct unlawful and willful. The Pennsylvania U.S. District Court summarily rejected this position:

> To establish that TU's policies contravene consumers' rights under the FCRA, Crane points to two key portions of Little's deposition testimony. First, Little testified that, when TU sends a CDV to a creditor, it never includes the documentation a consumer provides. Since section 1681i(a)(2)(B) clearly requires the CRA to provide the creditor with "all relevant information regarding the dispute that is received by the agency from the consumer," a reasonable jury could conclude that TU's refusal to transmit to Hann Crane's supplemental documentation was either knowingly or recklessly in contravention of Crane's FCRA rights. Second, Little testified that TU's policy is to report whatever information creditors provide. In light of *Cushman* 's holding that section 1681i(a) requires "something more than merely parroting information" that creditors provide, *Cushman*, 115 F.3d at 225, a reasonable jury could also find that TU's failure independently to analyze Crane's dispute constituted a knowing or reckless violation of the FCRA.

*Id.*   Maybe the only thing more remarkable than Trans Union's refusal to accept prior law informing it that its parroting procedures could willfully violate the FCRA is its refusal to accept express judicial criticism about that very "amnesia." As even another District Court has explained:

> This defendant made the same argument objecting to punitive damages in a similar case captioned *Crane v. Trans Union, LLC*, 2003 WL 22172346 (E.D.Pa. Sept.16, 2003). In *Crane*, Judge Dalzell explained that defendant's failure to transmit plaintiff's supplemental documentation to a creditor and defendant's practice of merely parroting information without verifying its accuracy, could be found by a reasonable jury to be knowing or reckless violations of the FCRA. *Crane*, 282 F.Supp.2d 311. Plaintiff in the present case objects to the same practices by the same defendant. The claim for punitive damages is not appropriate for summary judgment.

*Lawrence v. Trans Union*, 296 F.Supp2d at 590 (E.D. Pa. 2003).

It is in this context and against this same evidence that Trans Union asserts its claim that there was no evidence to support a finding of willfulness. The Defendant is simply wrong. Under the standards articulated in the consensus case law, Defendant's parroting of MBNA cannot fulfill the requirement that the agency conduct a reasonable reinvestigation. Similarly, a reasonable jury could properly conclude that under these procedures, Trans Union may read the consumer's dispute, but it will not "review and consider" it. Or that Trans Union never provides the relevant documents or dispute letters to the furnisher.

In the most recent FCRA trial against Trans Union – another case in which a separated spouse sued Trans Union for refusing to remove a MBNA credit card opened by the former spouse – the consumer obtained a verdict against Trans Union for $20,000 in actual damages and $100,000 in punitive damages. At the Final Pre-trial Conference the District Judge bluntly cautioned Trans Union and its present counsel, in permitting a

jury instruction about Trans Union's prior notice:

> THE COURT:  All right.  I think the information that Trans Union got a message from a court that told it its investigative procedures were inadequate is relevant.  I don't think it's prejudicial because it is notice that the investigative procedures were relevant. [...]
> THE COURT:  Cushman says you can't parrot information given you by the bank.
> MR. LUCKMAN:  Under some circumstances.
> THE COURT:  Period.  That's it.
> MR. LUCKMAN:  It says "under some circumstances."
> THE COURT:  Look, it's time that you-all came to realize that <u>when a Court tells you something, you have got to realize it, accept it, and do something about it.  If you don't, you're in trouble.  It's time that your client understood that, and that's what he's trying to prove.  And if you don't do it, you get punished for doing it.  That's just the way life is.</u>

*Mullins v. TransUnion*, 3:05cv888, (E.D. Va. 2006) (Exhibit H).  The jury was instructed:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of Federal Court have informed Trans Union, in cases in which it was a Defendant, that the Fair Credit Reporting Act's requirement for a Reasonable Reinvestigation must consist of something more than simply parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

At the time that each of the above decisions found Trans Union's FCRA violation was willful, nearly every Court (all but the Ninth Circuit) was operating under the belief that punitive damages were only available for conduct that was "knowing" or showed "conscious disregard."  In 2007, the United States Supreme Court adopted the lesser threshold used by the Ninth Circuit to include "reckless" conduct within the panoply of "willfulness."  *Safeco Insurance Co. of America v. Burr*, 127 S.Ct. 2201 (2007).  The standard for willfulness is now even lower than when each of the above Courts denied Trans Union's earlier willfulness summary judgment motions.  *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142, 151 and n.4 (4th Cir. 2008).  As the *Mullins*

Court explained:

> The case was tried on, and the jury was instructed pursuant to, the law of this circuit at the time of trial in the issue of willfulness. See *e.g., Dalton v. Capital Associated Industries, Inc.,* 257 F.3d 409 (4th Cir.2001). Thereafter, the Supreme Court of the United States decided *Safeco Ins. Co. of America v. Burr,* 127 S.Ct. 2201 (2007) which <u>actually articulated a standard for willfulness that was less stringent than the standard which controlled the trial and the jury verdict.</u>
>
> Viewed as a whole, the record here supports a finding of willfulness under either standard. The plaintiff presented evidence from which the jury reasonably found TU deliberately and consciously committed the violations of the FCRA found by the jury. Certainly, the evidence supports a finding under the rule of *Safeco.* <u>Indeed, from the record, the jury reasonably could have inferred that TU has chosen to disobey the FCRA's reinvestigation and related provisions because it is less expensive to do so, even if it loses a few cases, than it is to comply with the statute.</u>

*Mullins v. Equifax Information Services, LLC* (and Trans Union), 2007 WL 2471080 (E.D.Va. 2007) (emphasis added).

In light of the established case demanding a substantive investigation from Trans Union and the many warnings it has received from Courts across the country, Defendant's conduct is likely willful as a matter of law. Regardless, it is not a proper basis for Summary Judgment.

## III.    A REASONABLE JURY COULD FIND THAT THE PLAINTIFF SUFFERED ACTUAL DAMAGES.

Defendant has also challenged Plaintiff's claim for damages. Initially, the Plaintiff must set the context for Trans Union's argument. Actual damages are a necessary element of a FCRA negligence claim. 15 U.S.C. §1681o. If the Court concludes as a matter of law that the Plaintiff has not suffered any actual damages and as well finds that the Defendant's violation of law could not be willful, it should enter summary judgment in full. On the other hand, if the Court finds, as Plaintiff believes it must, that the

Defendant's violation of §1681i was willful and/or that he suffered some degree of actual damages, summary judgment would not be proper.

In addition to the FCRA actual damages negligence remedy, §1681o, the statute also provides a stronger remedy if the Plaintiff proves a CRA's violation was "willful." A prevailing Plaintiff is entitled to the greater of actual damages or between $100 and $1,000 in statutory damages.  15 U.S.C. §1681n.  He is also entitled to punitive damages. *Id.*  In fact, the jury could find and the Court award significant punitive damages with an award of only $1,000 in statutory damages. *Saunders v. Branch Banking And Trust Co. Of VA*, 526 F.3d 142 (4th Cir. 2008) (Affirming jury award of $80,000 in punitive damages and $1,000 in statutory damages for inadequate investigation).  Accordingly, the Court need not even reach the question of whether or not there are also actual damages if it denies as it must Defendant's motion as to willfulness.

Nevertheless, and although Plaintiff has already recovered sufficient amounts from other Defendants to reimburse his non-economic damages, he also will establish at trial additional economic damages attributable to Trans Union.   Even by Defendant's own admission, the Plaintiff has established that he sought a loan from Chase; Chase used his Trans Union report which contained the inaccurate MBNA account as its major derogatory item; and Plaintiff did not receive a Chase loan or even pre-approval. These facts alone are sufficient to allow a reasonable jury to draw a circumstantial evidence inference that Trans Union's failure to correct and delete the inaccurate MBNA account was a "substantial factor" in his inability to obtain a Chase loan or pre-approval.

Proof that credit was not granted is generally sufficient to meet a FCRA Plaintiff's damages burden. *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3rd Cir. 1996);

*Lendino v. Trans Union Credit Information Co.,* 970 F.2d 1110, 1113 (2d Cir.1992) (A reasonable jury could infer that the damages lender had seen the inaccurate report and refused plaintiff's application for credit based on that report, because "[t]here is, at least on the present record, no other evidence which reasonably demonstrates why Bloomingdale's rejected Lendino's credit application."); *Richardson v. Fleet Bank of Massachusetts,* 190 F.Supp.2d 81 (D. Mass. 2001). In fact, the only three evidentiary proofs needed to establish the mortgage denial are: (1.) The Plaintiff applied for the loan; (2.) Chase received the Plaintiff's credit reports at a time when the inaccurate account was being reported; and (3.) the Plaintiff did not receive the loan. *See e.g. McMillan v. Experian,* 170 F.Supp.2d 278, 284 (D. Conn. 2001) ("Notwithstanding the hearsay deficiency of plaintiff's affidavit, the evidence shows that plaintiff applied for insurance through Colonial Penn, Colonial Penn requested and received plaintiff's credit report while it contained the inaccurate negative information about the Associates account, and plaintiff was denied insurance. Thus, a reasonable factfinder could infer that the denial of insurance resulted from the negative credit report and was thus caused by Associates' allegedly negligent investigation.")

## CONCLUSION

Mr. Cornock has endured this battle with MBNA, and thereafter with Trans Union for over five years. Now, Trans Union asks the Court to end his chance to complete the enforcement of his statutory rights under the FCRA – a law almost uniformly interpreted to find Trans Union's processes unlawful. The Plaintiff respectfully asks the Court to deny Defendant's Motion for Summary Judgment for all of his claims under §1681i(a) and to permit his attorneys to bring this case to trial.

Respectfully submitted,

Troy T. Cornock

By his attorney,

Dated: May 21, 2009                    /s/ Roger B. Phillips, Esquire
                                       Phillips Law office, PLLC
                                       104 Pleasant Street
                                       Concord, NH  03301
                                       (603) 225-2767
                                       NH Bar No. 2018

## CERTIFICATION

I, Roger B. Phillips, Esquire, hereby certify that on this 21st day of May, 2009, a copy of the foregoing documents were served upon counsel of record by electronic filing using the CM/ECF system.

                                       /s/ Roger B. Phillips, Esquire