UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>Troy Cornock</u>

v.                          Civil No. 07-cv-391-JL
                            Opinion No. 2009 DNH 115
<u>Trans Union LLC</u>

# **O R D E R**

In this case involving a credit reporting agency's "reinvestigation" duty under § 611(a) of the Fair Credit Reporting Act ("FCRA"),[1] defendant Trans Union LLC moves for summary judgment. Plaintiff Troy Cornock's claim arises out of Trans Union's listing an outstanding account with MBNA in his credit report, even after he informed Trans Union that the account had been opened in his name by his then-wife without his knowledge or authorization.

This court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question) and 1332(a)(1) (diversity). After oral argument, Trans Union's motion for summary judgment is granted. As discussed <u>infra</u>, Cornock cannot show that Trans Union's report contained an "inaccuracy," as defined under

---

[1]Pub. L. No. 91-508, Title VI, sec. 611(a), 84 Stat. 1114, 1132 (1970) (codified as amended at 15 U.S.C. § 1681i (1998 & 2009 supp.)). Cornock also brought a claim against Trans Union under § 607(b) of the FRCA, 15 U.S.C. § 1681e(b) (1998), but affirmatively assented to its dismissal in his objection to the summary judgment motion.

applicable First Circuit precedent, and therefore cannot prevail on his claim against it under § 611(a).

## I.   **Applicable legal standard**

Summary judgment is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  The following facts are set forth in accordance with this standard.[2]

---

[2]Trans Union has moved to strike (triggering an objection and a reply) certain materials submitted with Cornock's objection to summary judgment, specifically, (a) paragraph 2 of Cornock's supplemental declaration, which provides an account of his alleged inability to qualify for a mortgage loan due to the presence of the MBNA account in his credit report, and (b) internal documents from the Consumer Data Industry Association, a group representing credit reporting agencies, planning its response to a report by the Federal Trade Commission to Congress about the automated consumer disputed verification process described infra.  For reasons that will appear, these materials have no bearing on the court's disposition of the summary judgment motion, so Trans Union's motion to strike them is denied as moot.  See Evans v. Taco Bell Corp., 2005 DNH 132, 10; see infra Part IV, n. 44.

## II.  **Background**

Acting without his knowledge or authorization, Cornock's
ex-wife opened a credit card account in his name with MBNA in
approximately June 1995.  Though Cornock and his ex-wife were
still married at that point--their divorce was not finalized
until 1998--he had recently moved out of their home, which was
the billing address on the MBNA account.  Cornock's ex-wife
proceeded to make purchases on the account, as well as sporadic
payments, through June 1998.  After the payments halted, however,
MBNA contacted Cornock, looking to collect the unpaid balance.
Cornock, who knew nothing of the account until that point, told
MBNA "that the credit card was not mine, that I never opened a
credit card account with MBNA, that I never requested, applied
for or possessed a credit card from MBNA, and I never charged any
items or made any payment to an MBNA credit card."

Unsurprisingly--at least to anyone who has ever engaged in a
dispute with a credit card company--Cornock's story did not
convince MBNA, which commenced an arbitration proceeding against
him in November 2001 for the outstanding balance.  Cornock
submitted a letter to the arbitrator, with a copy to MBNA,
explaining that he had not applied for the credit card in
question, but that his ex-wife had done so by forging his name.
Cornock noted that, to demonstrate this, he had asked MBNA to

3

produce the application and copies of receipts for any purchases
bearing his purported signature.  The arbitrator then set the
matter for a "document hearing,"[3] asking MBNA to submit the
materials requested by Cornock.  MBNA told the arbitrator that
those materials were "unavailable," but also irrelevant because
Cornock was liable on "an account stated cause of action" by
virtue of the alleged submission of payments on the account in
his name.[4]  In March 2002, the arbitrator found that "the
information and evidence submitted supports the issuance of an
[a]ward" against Cornock in the amount of $9,446.85.

MBNA later commenced an action against Cornock in
Hillsborough County Superior Court, seeking to enforce the
arbitration award.  See MBNA Am. Bank, NA v. Cornock, No. 03-C-
0018 (N.H. Super. Ct. Dec. 23, 2002).  While this action was
pending, in January 2006, Cornock wrote to Trans Union, asking it
to "investigate and remove the derogatory information" about the

---

[3]This seems to be a term of art referring to the
adjudication of a dispute by examining documentary evidence
rather than listening to live testimony or argument; the
arbitrator did not conduct a "hearing" in the sense that any
party or counsel appeared before him for that purpose.

[4]This rather imaginative claim was based on the allegation
that some payments were made out of a checking account held
jointly by Cornock and his ex-wife.  Cornock, however, has
steadfastly denied a joint interest in the checking account in
question.  For reasons that will appear, this dispute is
irrelevant to the summary judgment motion.

MBNA account from his credit report.[5]  Cornock stated that his ex-wife had opened the account without his knowledge or authorization by forging his name, as he had explained to MBNA. Cornock also asked Trans Union to "obtain a copy of whatever application, agreement or other basis MBNA claims supports its assertion that I owe on this account and compare my signature [on the letter] to any purported signature on my application . . . . I will pay the cost for a handwriting expert."  Neither this letter, nor the previous one, referenced MBNA's arbitration award against Cornock or the pending enforcement action.  There is no evidence that Trans Union became aware of either, in fact, until after it was named in the instant lawsuit.

In response to Cornock's letter, Trans Union electronically transmitted an "Automated Consumer Dispute Verification," or "ACDV," to MBNA.  According to Trans Union's internal procedures, an employee generates an ACDV for a particular account by identifying the nature of the consumer's dispute from among a pre-programmed menu in the company's computer system; here, this process resulted in an ACDV stating, in relevant part:

---

[5]Cornock sent the same letter to the other two major national consumer reporting agencies, Experian Information Solutions, Inc. and Equifax Information Services, LLC.  Cornock had previously written to Trans Union, in December 2005, asking it to remove the MBNA account from his credit history, but Trans Union informed Cornock in response that his letter referenced an account number that did not match any in his credit history.

> Consumer not liable for acct (ie [*sic*], ex-spouse, business).  If liable, provide complete ID and ECOA code.

> Consumer claims true identity fraud--account fraudulently opened.  Initiate investigation.

The ACDV did not further specify the nature of Cornock's dispute.

MBNA electronically transmitted a response to Trans Union, stating, "Verified as reported" and, on the line below that, "Ownership Verification Of: Date of Birth, Name, SSN."  This is how a creditor confirms its account information to Trans Union in the case of an "ownership dispute," i.e., a consumer's claim that the account actually belongs to someone else--simply by verifying at least two pieces of information about the consumer, such as his date of birth and social security number.  The creditor completes this process by clicking "verified as reported" from among a menu of options in its software; the only other two choices are "modify," to change the account information in some way, or "delete."  When a creditor responds "verified as reported," Trans Union automatically passes that response on to the consumer, without considering the dispute any further.

That is what happened here:  after MBNA electronically notified Trans Union that MBNA had verified Cornock's date of birth and social security number, Trans Union notified Cornock by letter in February 2006 that the MBNA credit card account had

been "verified, no change" (capitalization corrected).  This letter also stated, "Our investigation of the dispute you submitted is now complete . . . .  If our investigation has not resolved your dispute, you may add a 100-word statement to your report"--an option that, unsurprisingly, has no effect on the consumer's credit score, and which Cornock did not exercise.

Cornock did, however, successfully defend MBNA's action to enforce the arbitration award.  In an order issued in March 2007, the Superior Court voided the award on the basis that Cornock, who had never signed or otherwise manifested his assent to the credit card agreement with MBNA, had therefore never agreed to its arbitration provision.  MBNA Am. Bank, NA v. Cornock, No. 03-C-0018 (N.H. Super. Ct. Mar. 20, 2007) (Abramson, J.).  Though MBNA invoked the "account stated" theory accepted by the arbitrator, the Superior Court rejected it because, first, the most the evidence arguably showed is that payments on the card were made out of a checking account held jointly by Cornock, which was insufficient to prove his acknowledgment of the account, and, second, "'[a]n account stated cannot be made the instrument to create [a] liability where none before existed'" as the result of a contractual relationship.  Id. at 24 (quoting Bucklin v. Nat'l Shawmut Bank of Boston, 244 N.E.2d 726, 728 (Mass. 1969) (further internal quotation marks omitted)).  MBNA's

7

argument, the Superior Court observed, "would allow any credit card company to force victims of identity theft into arbitration, simply because that person's name is on the account." Id. at 25.

After receiving this favorable ruling in the Superior Court litigation, Cornock brought the present action against MBNA, Trans Union, and other credit reporting agencies, see note 5, supra. He has since settled and dismissed his claims against the other defendants. Within a month of being sued here, Trans Union deleted the reference to the MBNA account from Cornock's credit report; it is undisputed that he had not asked Trans Union to do so at any point since his letter of January 2006.

## III. **Analysis**

Cornock's sole remaining claim in this action asserts that Trans Union violated § 611(a) of the FCRA by failing to perform a reasonable reinvestigation into the MBNA account as it appeared in his credit report. Section 611(a) provides, in relevant part:

> if the completeness or accuracy of an item of information contained in the consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . .

15 U.S.C. § 1681i(a)(1)(A).  A consumer reporting agency that fails to comply with this provision is liable to the consumer for his actual damages and attorneys' fees if the failure was negligent, id. § 1681o(a), or, if the failure was willful, either actual damages or statutory damages, together with punitive damages and attorneys' fees, id. § 1681n(a).  See, e.g., Philbin v. Trans Union Corp., 101 F.3d 957, 962-63 (3d Cir. 1996).

To recover any of these damages under § 611(a), however, a consumer must show, among other things, "that the reported information was in fact inaccurate."  DeAndrade v. Trans Union LLC, 523 F.3d 61, 67 (1st Cir. 2008).  The court of appeals in DeAndrade reasoned that, because "[t]he FCRA is intended to protect consumers against the compilation and dissemination of inaccurate credit information . . . , it is difficult to see how a plaintiff could prevail on a claim for damages under [15 U.S.C.] § 1681i without a showing that the disputed information disclosed by the credit agency was, in fact, inaccurate."[6]  Id. at 67.  Thus, the court explained, "[t]o determine whether a consumer has identified a factual inaccuracy on his or her credit

---

[6]Though the principal purpose of the FCRA was to protect the banking system against the consequences of inaccurate credit reporting, see 15 U.S.C. 1681(a)(1), the Act also expresses the intent that this be done "in a manner which is fair and equitable to the consumer, with regard to the . . . accuracy . . . of such information," id. § 1681(b).

report that would activate § 1681i's reinvestigation requirement,
'[t]he decisive inquiry' is whether the defendant credit bureau
could have uncovered the inaccuracy 'if it had reasonably
investigated the matter.'" Id. at 68 (quoting Cushman v. Trans
Union Corp., 115 F.3d 220, 226 (3d Cir. 1997) (bracketing added
and citations omitted by the court)).

The DeAndrade court ruled that the plaintiff there could not
make this showing as a matter of law because, though he denied
signing any documents granting the mortgage referred to in the
credit report--claiming that his signature on those documents had
been forged--the creditor "did in fact have documentation
granting it a mortgage on the residence of one DeAndrade who was
in fact the same DeAndrade that had been making the loan payments
and is the plaintiff." Id. at 68. The court reasoned that

> what DeAndrade is attacking is the mortgage's validity.
> Whether the mortgage is valid turns on questions that
> can only be resolved by a court of law, such as whether
> DeAndrade ratified the loan [by making monthly payments
> on it for nearly two years]. This is not a factual
> inaccuracy that could have been resolved by a
> reasonable investigation, but rather a legal issue that
> a credit agency such as Trans Union is neither
> qualified nor obligated to resolve under the FCRA.

Id. Section 611(a), the court instructed, does not countenance
such a "collateral attack against a lender by bringing an FCRA
claim against a consumer reporting agency." Id. Instead, a
consumer must challenge the validity of the debt in a judicial

10

forum and, if that court "rule[s] the [debt] invalid and the [agency] continue[s] to report it as a valid debt, <u>then</u> [the consumer] would have grounds for a potential FCRA claim."  <u>Id.</u>

Trans Union, in moving for summary judgment here, likens Cornock's dispute over the MBNA credit card account to the plaintiff's dispute over the mortgage loan in <u>DeAndrade</u>, because Cornock "challenged whether the credit card debt was legally enforceable against [him]" despite the fact that it had been incurred in his name by his ex-wife without his knowledge or authorization.  Cornock, in contrast, maintains that he challenged only "whether or not [MBNA] had an application or documents signed by [him]," which raises "purely a factual inquiry," not any "technical or complicated legal question."

As the parties' positions illustrate, classifying a dispute over a debt as "factual" or "legal" will usually prove a frustrating exercise--as is the task of differentiating "fact" from "law" in other contexts, <u>see</u>, <u>e.g.</u>, James B. Thayer, "<u>Law and Fact</u>" in <u>Jury Trials</u>, 4 Harv. L. Rev. 147 (1890).  Cornock's challenge to the debt to MBNA could be called "factual" in the sense that, as he suggests, he did not sign the credit card application as a matter of fact; but it could also be called "legal" in the sense that, as Trans Union suggests, he claimed that he therefore had no liability as a matter of law while MBNA

11

claimed otherwise based on alleged payments to it out of an
account he jointly held.  Likewise, the plaintiff's dispute in
DeAndrade was "factual" in the sense that he claimed he did not
sign the mortgage paperwork as a matter of fact; but "legal" in
the sense that he claimed the mortgage was therefore invalid as
a matter of law while the lender claimed otherwise based on his
making payments on the underlying loan.  Each of these disputes
had both a factual component, i.e., the consumer's claim that he
had not signed, and a legal component, i.e., the creditor's
claim that the consumer was liable anyway.

       This court does not read DeAndrade, then, as basing the
definition of "accuracy" under 15 U.S.C. § 1681i on the often
unworkable distinction between a "factual" and a "legal"
inaccuracy in a reported debt.  Rather, DeAndrade's definition
of the "inaccuracy" necessary to prevail on a claim under that
subsection of the FCRA is the definition the court expressly
adopted:  "whether the defendant credit bureau could have
uncovered the inaccuracy 'if it had reasonably reinvestigated
the matter.'"  523 F.3d at 68 (quoting Cushman, 115 F.3d at 226
(citations omitted by the court)).  If doing so would have
revealed information establishing the plaintiff's responsibility
for the debt--like the creditor's documentation linking the

12

plaintiff to the mortgage in <u>DeAndrade</u>--then the plaintiff

cannot show the "inaccuracy" needed to prevail under § 611(a).

Here, no reasonable reinvestigation of the MBNA credit card

account would have uncovered the inaccuracy claimed by Cornock,

i.e., that he was not responsible for the balance because,

unbeknownst to him, his ex-wife had opened the account by

forging his name.  Unlike in <u>DeAndrade</u>, however, this conclusion

does not follow from the creditor's possession of documentation

tying Cornock to the debt; indeed, MBNA told the arbitrator that

it had no credit card agreement bearing Cornock's purported

signature.  The conclusion follows instead from the existence of

the arbitrator's decision, which, as demonstrated by the record

of those proceedings as described by the Superior Court, awarded

MBNA the full amount of its claim against Cornock in spite of

his argument that he had never signed the credit card agreement

and MBNA's concession that the agreement was "unavailable."

This award was issued on March 26, 2002, and remained in effect

until it was vacated by the Superior Court on March 20, 2007.

Any reasonable reinvestigation by Trans Union into Cornock's

complaints of December 2005 and January 2006, then, would have

turned up the arbitration award against Cornock, which, by that

point, was the subject of a publicly filed enforcement

proceeding in the Superior Court.  <u>See</u> <u>Dennis v. BEH-1, LLC</u>, 520

F.3d 1066, 1071 (9th Cir. 2008) (observing that "examining the court file" of the creditor's action against the debtor is part of a reasonable reinvestigation under 15 U.S.C. § 1681i); Henson v. CSC Credit Servs., 29 F.3d 280, 285 (7th Cir. 1994) ("reliance on official court records is unlikely to lead to inaccurate credit reporting except in isolated instances").[7]

Of course, the arbitration award was ultimately vacated in that very enforcement proceeding, but that did not happen until more than a year after Trans Union had processed Cornock's dispute.  While the illegitimacy of the award may have been fairly obvious, as the Superior Court's analysis suggests, DeAndrade teaches that the FCRA imposes no obligation on consumer reporting agencies to resolve "questions that can only be resolved by a court of law."  523 F.3d at 68.  Whether an arbitration award is valid is precisely that sort of question.

---

[7]In Henson, the court of appeals concluded that a credit report was inaccurate in stating that a judgment had been entered against the plaintiff when, though the docket contained a notation to that effect, the official act of entering a judgment had not yet occurred.  29 F.3d at 285.  Here, in contrast, Trans Union did not report that an arbitration award had entered against Cornock, but simply that the debt enforced by the award existed, and there was nothing on the face of the award suggesting its invalidity anyway.  Unlike in Henson, then, the official records at the time Cornock raised the dispute with Trans Union established the report's accuracy, rather than its inaccuracy.  See also Dennis, 520 F.3d at 1069 (ruling that credit report was inaccurate in reporting that judgment had entered against the plaintiff when, in fact, the action had been dismissed without prejudice).

Indeed, in <u>DeAndrade</u>, the plaintiff had already commenced a lawsuit seeking to invalidate the debt in question by the time he asked the defendant to reinvestigate it, <u>id.</u> at 63, but the court observed that the defendant was not required to remove the debt from his credit report unless and until he prevailed in that action, <u>id.</u> at 68.  Because any reasonable investigation by Trans Union into Cornock's debt to MBNA would have uncovered the facially valid arbitration award, at least before it was vacated in March 2007, Cornock cannot show that his credit report was "inaccurate" in the sense required to prevail under § 611(a).  <u>See</u> <u>Williams v. Colonial Bank</u>, 826 F. Supp. 415, 418 (M.D. Ala. 1993) (granting summary judgment for credit reporting agency on § 611(a) claim because "there was no factual deficiency that could have been remedied by reinvestigating the records"), <u>aff'd</u>, 29 F.3d 641 (11th Cir. 1994) (table).

Cornock does not fairly question that a reasonable reinvestigation would have turned up the arbitration award. Instead, he suggests that, because Trans Union did not learn of the award until well after it had processed his dispute letters, it is immaterial to the accuracy of his credit report at that time.  Cornock's position, however, cannot be squared with the express holding of <u>DeAndrade</u>.  That case holds, again, that "[t]he decisive inquiry" in "whether a consumer has identified a

factual inaccuracy on his or her credit report that would activate [15 U.S.C.] § 1681i's reinvestigation requirement" is "whether the defendant credit bureau <u>could have</u> uncovered the inaccuracy if it had reasonably reinvestigated the matter."  523 F.3d at 68 (emphasis added; internal quotation marks omitted).

The nature of the inquiry, then, is predictive, not retrospective; it asks what <u>could have happened</u> if the defendant had conducted a reasonable reinvestigation, not what <u>did happen</u> as a result of whatever reinvestigation the defendant actually performed.  As one court has observed, albeit in a slightly different context, "[t]he question is not whether [the defendant] knew it was reporting inaccurate information but whether it should have known this by conducting a reasonable investigation."  <u>Scheel-Baggs v. Bank of Am.</u>, 575 F. Supp. 2d 1031, 1040 (W.D. Wis. 2008) (denying summary judgment to defendant on claim under 15 U.S.C. § 1681s-2(b), "which requires furnishers of credit information to conduct an investigation when they receive notice of a dispute," based on existence of arbitration decision denying disputed claim).  Thus, the inaccuracy test--which, as <u>DeAndrade</u> holds, is an independent element of a § 611(a) violation, in addition to the lack of a reasonable reinvestigation--functions as a causation requirement, linking the defendant's failure to reinvestigate as

16

required by the statute to the plaintiff's harm from the continued appearance of the disputed item in his credit report.

Indeed, as just discussed, the difficulty of connecting the harm to the violation without any inaccuracy requirement was the court's principal rationale for adopting one in <u>DeAndrade</u>.  523 F.3d at 67-68.  Given the undisputed existence of the arbitration award at the time Cornock brought his dispute over the MBNA debt to Trans Union's attention, its failure to conduct a reasonable reinvestigation could not have harmed him:  any such act would simply have uncovered the equivalent of a court order which, on the face of it, affirmed the debt.[8]

---

[8]"Final arbitral awards are entitled to the same preclusive effect as state court judgments, at least as concerns claims and issues actually raised."  <u>Wolf v. Gruntal & Co.</u>, 45 F.3d 524, 528 (1st Cir. 1995).  Of course, New Hampshire law authorizes the Superior Court to vacate an arbitration award if, among other reasons, "the arbitrators have exceeded their power," N.H. Rev. Stat. Ann. § 542:8, which is ultimately what happened; as <u>DeAndrade</u> observes, however, a credit reporting agency "is neither qualified nor obligated to resolve" such challenges, but can generally take the award at face value.  523 F.3d at 68. Thus, Cornock's argument that the arbitration was essentially a sham proceeding--conducted without Cornock's meaningful participation, by an arbitrator controlled by MBNA--is irrelevant, at least to his § 611(a) claim.  Leaving aside that this point was not made until oral argument, and is unsupported by anything in the record, <u>DeAndrade</u> is clear that § 611(a) does not require a credit reporting agency to investigate latent infirmities in a document that, on the face of it, affirms the debt in question.  That rule is particularly apt here, where Cornock did not provide Trans Union with any reason to doubt the validity of the award and, in fact, failed to mention it at all.

The result would have been the same, moreover, if the investigation had examined--or, for that matter, even vindicated--Cornock's claim that his signature on the credit card application had been forged, because the arbitrator had ruled that Cornock was nevertheless liable by virtue of the payments out of the alleged joint account, as MBNA had argued (conceding that it could not produce any signed application).[9] It follows that Cornock cannot show any inaccuracy under the test in DeAndrade.

By the same reasoning, the decision in Cushman--which, again, endorsed the very same test, 115 F.3d at 226--does not assist Cornock here.  It is true that Cushman, like this case, arose out of a plaintiff's claim that her credit report included outstanding accounts opened without her knowledge or authorization by a third person who made fraudulent use of her social security number and other identifying information.  115 F.3d at 222.  And, also like in this case, when the plaintiff presented these facts to the defendant reporting agency in demanding it reinvestigate the accounts under 15 U.S.C. § 1681i,

---

[9]This undisputed fact is fatal to Cornock's contention, forcefully presented by his counsel at oral argument, that any reasonable reinvestigation by Trans Union would have necessarily included asking MBNA to produce a signed copy of the credit agreement; there is no way that request "could have" uncovered the claimed inaccuracy, given the existence of an arbitration award ruling that Cornock was liable to MBNA regardless.

the defendant simply asked the credit card companies whether the identifying information in their records matched that in Trans Union's report.  Id.  In a further parallel to Cornock's situation, the responding credit card company was able to verify the identifying information--predictably, in light of the plaintiff's claim that a third person had fraudulently given the creditor that information in opening the account.  Id.

Overruling a directed verdict for the defendant on the plaintiffs § 611(a) claim, the Cushman court reasoned that a "jury could have concluded that after [the defendant] was alerted to the accusation that the accounts were obtained fraudulently, and then confronted with the credit grantors' reiteration of the inaccurate information, [the defendant] should have known that the credit grantors' were unreliable to the extent that they had not been informed of the fraud."  Id. at 226 (internal quotation marks omitted).  The court reasoned that a jury could have further found that this knowledge obligated the defendant "to go beyond" the information provided by the creditor in reasonably reinvestigating the plaintiff's dispute as required by 15 U.S.C. § 1681i.  Id. at 224-26.

Cushman, then, certainly supports the view that, after MBNA verified the credit card account as Cornock's despite his explanation to Trans Union that his ex-wife had opened the

19

account by forging his signature, a jury could find that Trans
Union shirked its duty under § 611(a) by failing to conduct any
independent investigation.  See also Stevenson v. TRW Inc., 987
F.2d 288, 293 (5th Cir. 1993).  Frankly, it is hard to see how a
"reasonable reinvestigation" of a dispute premised on identity
theft can consist of merely asking the creditor to verify the
identifying information on the consumer's account, because the
very nature of such a dispute presumes that the creditor has the
identifying information; that is not what the consumer is
complaining about.  What the consumer is complaining about is
that the information was provided by a third party posing as him
without his knowledge or authorization.  There would seem to be
no chance of "reasonably reinvestigating" such a dispute through
the method employed here and, so far as the record reveals, as a
matter of course by Trans Union.

But Trans Union, wisely enough, does not seek summary
judgment on the ground that it conducted a reasonable
reinvestigation as a matter of law; it seeks summary judgment on
the ground that, even if it had, it could not have discovered
any inaccuracy in listing the MBNA account on Cornock's report.
That is correct and, under DeAndrade, fatal to Cornock's claim

against Trans Union under 15 U.S.C. § 1651i.[10]   The crucial
difference between Cornock's case and <u>Cushman</u> is that, there,
investigating beyond the creditor's verification could have
turned up information casting doubt on the validity of the debt
while, here, that exercise would have turned up no more than an
arbitration award affirming the validity of the debt--despite
the creditor's conceded inability to produce a credit agreement
bearing the debtor's signature.

    As <u>DeAndrade</u> teaches, once Cornock lost to MBNA in the
arbitration proceeding, his only recourse was to seek relief
from the award in court, rather than "launching an impermissible
collateral attack . . . by bringing an FCRA claim against a
consumer reporting agency" like Trans Union.   523 F.3d at 68.
And, if "Trans Union had continued to report [the MBNA account]
as a valid debt" after the Superior Court had voided the
arbitrator's decision, "<u>then</u> [Cornock] would have grounds for a

---

[10]As the court of appeals noted in <u>DeAndrade</u>, "[i]t is . . .
not necessarily apparent, on the face of the statute, that a [15
U.S.C. §] 1681li plaintiff must also adduce sufficient evidence
to show that the disputed information was in fact inaccurate, as
opposed to merely showing that the plaintiff disputed its
accuracy and had informed the agency accordingly."   523 F.3d at
67.   Indeed, the latter reading--that, regardless of any <u>actual</u>
inaccuracy, an agency violates § 611(a) by failing to conduct a
reasonable reinvestigation into a <u>claimed</u> inaccuracy--is
supported by the provision's literal language.   But the court of
appeals nevertheless rejected such an interpretation, 523 F.3d at
67-68, and, needless to say, this court must do the same as a
matter of adherence to binding precedent.

potential FCRA claim" against Trans Union.  Id.  But Cornock did not ask Trans Union to reinvestigate the debt at any point between the end of the Superior Court litigation and the beginning of this one, at which point the debt was stricken from his credit report.  Trans Union is entitled to summary judgment on Cornock's sole remaining claim.[11]  The court need not reach Trans Union's other arguments for summary judgment.

## III. **Conclusion**

For the foregoing reasons, Trans Union's motion for summary judgment[12] is GRANTED and its motion to strike[13] is DENIED as moot.  The clerk shall enter judgment accordingly and close the case.

---

[11]Cornock asserts that Trans Union also violated § 611(a) by failing to (i) "include all relevant information regarding the dispute that [it] ha[d] received from the consumer" to MBNA as required by 15 U.S.C. § 1681(a)(2)(A), (ii) "review and consider all relevant information submitted by the consumer" as required by 15 U.S.C. § 1681(a)(4), and (iii) delete the reference to the MBNA account as inaccurate or unverifiable, as required by 15 U.S.C. § 1681i(a)(5)(A).  The lack of inaccuracy in the Trans Union report, however, is fatal to these claims as well, because "without a showing that the reported information was in fact inaccurate, a claim brought under § 1681i must fail." DeAndrade, 523 F.3d at 67.  Cornock does not argue that he can recover under any of these theories without proving the requisite inaccuracy.

[12]Document no. 34.

[13]Document no. 44.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  July 29, 2009

cc:  Leonard A. Bennett, Esq.
     Roger B. Phillips, Esq.
     Bruce S. Luckman, Esq.
     William E. Christie, Esq.